Wright, et al. *v.* Petrie, et al.

## DECEMBER TERM, 1843.

### Daniel W. Wright, *et al. v.* William Petrie, *et al.*

To discharge one party to a contract, on the ground of the failure of the other to perform his part, such failure must be clearly established by full, direct, and satisfactory evidence.

P. contracted to build a railroad for the Brandon Bank, at a stipulated price, and receiving money from the bank for that purpose, executed a mortgage, to secure its proper application ; P. abandoned the work before its completion, and while the Bank was in advance of money to P. ; the Bank, being in embarrassed and failing circumstances, without valid consideration, voluntarily released the mortgage, and discharged P. from the debt ; *held,* that the release of the mortgage and the discharge of the debt were fraudulent and void, as to the judgment creditors of the bank.

In forming an estimate of the damages sustained by one party, for the failure of the other to perform a contract between them, the possible profits of the one, or the amount possibly saved to the other, are not proper *criteria.*

A corporation is trustee for the creditors ; and where a transfer of its property is made without valid consideration, they may pursue the property, and force the assignee thereof to account for it.

A court of equity will subject the *choses in action* of a debtor, in the hands of a voluntary assignee, to the payment of the debt of a judgment creditor.

P. being about to construct a railroad for an incorporated company, which was to make advances of money for that purpose, executed a mortgage to the company, to indemnify them against any loss by reason of his failure to comply with his contract ; P., at a time when the company were largely in advance to him, beyond the amount expended, abandoned his contract ; *held,* that as to the sum so in advance, by the company, the damages sustained by them would be considered as liquidated, and so far the mortgage and damages would be subject in equity to a judgment creditor of the company, seeking to subject them as equitable assets.

Where a judgment creditor has his execution returned "*nulla bona,*" but afterwards levies the same on personal property, in which the defendant in the execution has merely an equitable interest, and pending the levy files his bill in the court of chancery, to subject the equitable interest of the defendant to the payment of his judgment debt ; *held,* that the right of the complainant to the equitable relief was established by the return of "*nulla bona,*" and was not disproved by the levy upon property, *not subject to sale under execution.*

In a contract between a company and an individual, wherein the latter agreed to build a railroad for the former, and the former agreed to pay the latter in instalments, as the work progressed ; *held,* that the latter would be entitled to recover a ratable portion of the money, for the ratable performance of the work.

Where one party abandons a contract with the consent of the other, which he has undertaken, that consent would bind the other to pay for that portion of the contract actually accomplished.

[It is not considered necessary to the proper understanding of the points involved in this case, to give a close abstract of all

the pleadings and proofs : such an abstract would constitute a volume in itself. Such portions only are presented as bear upon the points at issue, and decided.]

THE Real Estate Bank of Columbus, Mississippi, obtained two judgments at law against the Mississippi and Alabama Railroad Company, on the 23d of October, 1839, amounting in the aggregate to about the sum of one hundred and fifty thousand dollars. The executions on these judgments having been returned " *nulla bona*," were afterwards levied upon divers slaves, as the property of the defendants therein : Wm. Petrie claimed the negroes, and gave a bond to try the right of property in the court at law. The complainants, who were the plaintiffs in the judgment at law, aver in their bill, that Petrie's claims to the negroes are founded in fraud, and that the directors of the Mississippi and Alabama Railroad Company, familiarly known as the " *Brandon Bank*," were parties to the fraud : that Petrie based his claim on certain articles of agreement between the Brandon Bank and himself, by which Petrie agreed to make, complete, and put in operation a railroad from Jackson to Brandon, and to construct and prepare everything for that end ; all the items of which were enumerated in the agreement. The road was to be begun within one month from the 23d of February, 1837, and completed within two years from that date : for which the company agreed to pay Petrie two hundred and four thousand dollars. The first payment of twenty thousand dollars to be made in one month from the commencement of the work, and the rest at intervals of thirty days, as the work might require it ; of which Petrie was to be the judge. One hundred thousand dollars of the sum was to be paid to Petrie at intervals of from six, eight, ten, and twelve months, in sums of twenty thousand dollars each, by him to be invested in negro slaves to work on the road ; which negroes Petrie agreed to mortgage to the company, with all other property in his possession, for the faithful performance of his contract. The agreement further stipulated to pay Petrie two dollars for every cubic yard of rock he might encounter in excavating. The bill then averred, that Petrie had purchased the slaves levied

on, and others, with the money furnished him by the bank ; that, instead of one hundred, he laid out one hundred and fifty-nine thousand dollars in buying them ; that the company not only paid Petrie the sum they stipulated, but more than two hundred and forty thousand dollars besides ; yet, that Petrie had not finished any part of the road, and had not attempted to build many of the structures and works enumerated in the contract. That besides this money, Petrie received a salary of forty-five hundred dollars a year : that in two years he abandoned the road half finished, in a ruinous and worthless condition ; abandoned the contract, took the slaves and other property, and embarked in the cultivation of cotton : that, upon a fair settlement with the company, Petrie owed it a large sum ; that the mortgage had never been executed as agreed upon ; that the contract, however, created a right in equity in the Brandon Bank to a mortgage ; and that this equitable mortgage, so created, had been forfeited : that it embraced other property beside the negroes levied on, which the bill describes : that the officers of the Brandon Bank had permitted Petrie to do as he pleased with the property, and had deserted and abandoned the institution ; and that Petrie was without means when he entered upon the contract with the bank. The bill prayed, that this contract might be set aside, William Petrie compelled to account with the Brandon Bank, and pay, out of the sum due to it, the amount of the judgments, or for other relief.

William Petrie answered the bill : he admitted the contract as set forth in the bill, between himself and the Brandon Bank, but denied that there had been any fraud in the dealings between them. He stated, that prior to his employment by that company, the Jackson and Brandon Railroad and Bridge Company owed him six thousand, and he was to receive thirty-seven thousand five hundred dollars from them, for building a bridge over Pearl river ; both which debt and contract were assumed by the Brandon Bank, when they employed him as their engineer, and entered into the contract to construct the railroad. He admitted the investiture of one hundred and thirty-six thousand dollars in slaves, to be employed in the erection of the road, and which he bought with the money furnished

him by the bank : that he bought the slaves for his own use, with his own money paid him for his work, and that the Brandon Bank had no rights or interest in them beyond their right to a mortgage upon them under the contract, which he had·been always ready to give, and had actually executed.   He denied the right of the bank to any of the property stated in the bill to be the property of the bank, in his possession ; it had been all purchased with his own money paid him by the bank.

He filed an account with his answer, exhibiting the amount of money he had received from the bank, being two hundred and ninety-eight thousand dollars ; a great deal of which was at a discount, and used at a loss : of this sum, was $125,000 in their own notes, which he estimates at $22,800.   That on the 21st of December, 1839, a final settlement took place between him and the company : that the company had not complied with its engagements with him, and had thus enhanced the costs of the road.   This additional expense he had demanded of the company, which they refused to allow; but at length a compromise was effected, by which he was discharged from any further connection with the road, his contract rescinded, the mortgages cancelled, and the road, so far as done, received in full satisfaction of his part of the contract ; and the company discharged from any further payment on account of the contract.   This settlement was made with some delay and difficulty, in the presence and by advice of counsel employed by the company. The account exhibited by him against the company, and which brought the company in his debt, and which resulted in the compromise, is filed with his answer.   It is headed, " An approximate estimate of the enhanced cost of constructing the Jackson and Brandon Railroad, Turnpike, and Bridge, on account of the failure of the company to comply with their engagement." .

The items of which were in these words :

" Had funds been furnished in July, 1837, as requested, for the purchase of iron, engine, and cars, the railroad and bridge could have been finished at least one year ago, and the stocks for sawing the lumber could have been conveyed on the railroad by the aid of the engine : also, all the materials for constructing the railroad and bridge could have been conveyed in the same manner, which would

Wright, et al. v. Petrie, et al.

have saved the expense of 85 horses and oxen, which, estimated at
75 cents per day, say 300 days, amounts to                   $19,125·00
   " And 12 drivers to attend the same, at $45 per
month, 12 months,   .   .   .   .   .   .         6,480·00
   " Also extra time of 3 managers, at $1500 each,     4,500·00
   " Loss by being obliged to anticipate the par funds
that were voted me by the directory, which were not
furnished at the time specified, thereby obliging me to
purchase on a credit, at advanced prices, the neces-
saries for prosecuting the work, say 10 per cent. on
$40,000,         .   .   .   .   .   .   .         4,000·00
   " Loss on $260,000 Brandon money, depreciated
15 per cent.,   .   .   .   .   .   .   .         39,000·00
   " Had I received the iron, the bridge could have
been built 8 months before my contract expired, and I
should probably have received in tolls, on the bridge
and turnpike road,   .   .   .   .   .   .         5,000·00
   " Detriment to myself by detention here, say one
year at least, and consequent prevention from entering
into any profitable engagement that might have offered,
say   .   .   .   .   .   .   .   .         7,500·00

                               $85,605·00"

He denied that he had failed to comply with his contract ; he had
always been ready to finish the road, when the company would put
it into his power to do so ; that he commenced within the specified
time, and contined the work till December, 1839, but that he was
continually hindered by the disability of the company to furnish him
funds to buy iron ; that the iron bought by the company was attached
in New Orleans by their creditors, which, together with their ina-
bility to obtain the right of way, retarded his operations.    He de-
nied that the road was not half finished, but admitted that but a por-
tion of the wood and none of the iron rails were laid ; that a great
deal of the road was unfinished ; that the turn-outs, turning-plat-
forms, side-roads, crossings, and water-stations, were not commenc-
ed, because they were not needed until the road was completed.

He stated that the company, at the time they settled, were greatly in his debt for damages suffered by him, to discharge which damages, they had released him from his debt to them, and from the mortgage which he had made to them upon slaves he purchased with the one hundred thousand dollars, which mortgage had been cancelled by the agreement and settlement with the company ; that he was not without means when he entered upon the contract with the company, but was worth about twenty thousand dollars, which he had also invested in slaves ; that he mortgaged to his brother, F. H. Petrie, sixty of the slaves, to secure $29,000, which he owed him ; that when the company released him from the contract, his brother, F. H. Petrie, agreed to finish the road, and he went his brother's surety, upon certain stipulations, upon the performance of which by the company, he feels bound to complete the road, but which it is not deemed necessary to notice here.

W. Petrie died during the progress of the case, but the suit was revived in the names of F. Petrie and W. Petrie, his executors.

The proof taken was voluminous ; only part of it will be noticed.

William H. Shelton testified, that he was a director of the bank during its existence ; that the bank claimed no interest in the negroes bought by Petrie, except through the mortgage, which Petrie had executed, but which had been cancelled and returned to him ; that W. Petrie suspended work on the road for want of funds, which the company had promised, but failed to furnish ; that F. H. Petrie worked the road afterwards, until he was stopped by the owners of the land ; that while Charles Lynch was president of the bank, Petrie had a final settlement with them, when, in consideration of the losses of Petrie by delay, for want of funds, on uncurrent money, by freshets, decay of timber, &c., it was then agreed, if Petrie would build the road, according to contract, the company would release all claims against him, and pay him, out of the receipts of the road, fifteen thousand dollars.

Upon cross-examination, he testified, that Petrie had received, on his drafts and checks, $294,794·91, besides $17,266·95, expended in iron, and $125,000 in notes of the bank, which the bank had authorized him to dispose of in New Orleans, in buying iron, and which he had accounted for at eighteen cents on the dollar;

that much of the work Petrie contracted to do was not yet done ; and that the road was of no value in its then condition ; that before Petrie went to New Orleans to buy iron for the road, to guard him from arrest, the bank gave him a release of liability to it ; but that the subsequent settlement was effected in good faith.

. H. K. Moss testified, that he was one of the directors of the bank ; that when Petrie settled with it, the bank owed him upon account ; and the final agreement was, that the bank would release him from his contract and discharge his mortgage, if his brother would complete the road for $15,000, to which his brother acceded, and the settlement was made.

John F. Blow testified, that the grading was finished on the whole route.

W. G. Bullock testified, that he was clerk of the company ; that they had advanced to Petrie, by the 18th of Nov. 1839, $451,-556·11, of which the witness believed, about $40,000 was improperly charged.

The other testimony is not inserted, as it either repeats what has been testified, or is not important to the proper understanding of the opinion of the Chancellor.

The following are the resolutions, passed by the board of directors of the bank, at their meeting on the 21st of December, 1839.

" *Resolved*, That Wm. Petrie be, and he is, hereby, released from that portion of his contract, for the construction of the railroad, in which he has obligated himself to furnish a locomotive engine for the same, and that seven thousand dollars, the estimated price, be passed to his credit.

" *Be it further resolved*, That the cashier be required to cancel the mortgage, given by said Petrie to this company, now remaining on record on the books of this bank.

" Whereas this company are under obligation to furnish Wm. Petrie, contractor of the railroad, a certain amount of par funds, to enable him to complete the road, and this bank being unable to furnish said funds, therefore,

" *Resolved*, That the said Petrie be, and he is, hereby, requested to prosecute said road to completion, at his own expense, and that he retain the use of it, until the profits arising therefrom shall be

sufficient to pay him such balance as this company may owe him, after the completion of said road."

" The above is a true copy from the minutes.   R. G. Crozier, Cashier."

*Evans*, for the complainant.

(The analysis of the pleadings and testimony, furnished by Mr. Evans in this case, and his comments thereon, are so voluminous as to preclude their publication.   The points made by him will be briefly stated.)

He contended that, from Petrie's own answer, it was apparent that the company were largely in advance to him, beyond the whole sum for which he agreed to complete the road, and yet no part of the road was completed.

From a careful comparison of the testimony of Petrie's own witnesses, he contended that it was apparent Petrie had received over and above the amount agreed upon, the sum of $227,470·86.

He controverted the position, assumed by Petrie, that the company were to assume the contract of the Jackson and Brandon Bridge Company ; that no such assumption appeared in the contracts, or had been established by parol proof, and he denied that parol proof could be admitted to vary the written contracts.

He contended that, if every item claimed by Petrie were allowed to him, he would still be upwards of sixty thousand dollars in arrears.

He exhibited, at length, the testimony of the various witnesses, who stated that Petrie abandoned the work for want of funds, and displayed their inconsistency with each other, and with the answer of Petrie.

He contrasted the allegations of Petrie, that he abandoned the work for want of a right of way in the company, with the admissions of Petrie and the proof, that the road was graded the entire route, and that he had finished the whole road, except the laying of the iron rails.

He contended that the settlement with the directory had not discharged Petrie from the contract he was under, or his liabilities to the company, but that they were still subsisting.

*Cocke*, and *W. Thompson*, on same side.

*Robert Hughes,* for defendants.

The question, by the admission of the counsel upon the part of the complainant, seems to be narrowed down to, Whether the complainants have shown a forfeiture of the condition of the mortgage, by Petrie, to the Mississippi and Alabama Railroad Company? And whether they can have the benefit of that forfeiture? And if they can, What will be the decree which the Court will pronounce?

The defendants insist, that each of these questions are for them :

1. Was there a forfeiture of the mortgage? The consideration of this question involves the construction and nature of the agreements between the defendant, Petrie, and the Miss. and Ala. Railroad Company and the Jackson and Brandon Railroad and Bridge Company.

The construction of the contract for the building the railroad is very important, in order to ascertain how much money was to be paid, and when, to Mr. Petrie. On the other side it is asserted, that Petrie was not entitled to the whole of the money until the time had arrived at which the road was completed ; but that payments were to be made, first, of $20,000, in thirty days ; and then that the $100,000, agreed to be paid to buy negroes, and the first payment of twenty thousand dollars was to be deducted from the $204,000, and then the balance of $84,000 was to be divided by twenty-three, the number of months left, up to the period at which the work was to be completed, which would leave the sum of $3652·17, to be paid in periods of thirty days ; and this is insisted upon, because it is said that Petrie had given no security to perform his contract. Now, on 'our side, we insist such is not the agreement, because the terms used in the writing are directly and positively the other way. There is no dispute that $120,000 was to be paid, in the manner pointed out in the agreement, at the end of the first thirty days. In reference to the balance of $84,000, the contract is, that the payments are to be made in intervals of about thirty days ; in sums of about any amount, or in proportion to the amount due, and the number of months the contract had to run to maturity ! No such thing; but in substance, as it might be necessary to carry on the work, to buy iron, and to furnish engines, as Petrie might determine ; in other words, whenever Mr. Petrie should find

it necessary, to carry on the work, to buy iron, or furnish the engine, so that his requisitions were made at the periods specified, he was entitled to receive the amount which was necessary, *within* his contract; and because this agreement was made, Petrie, on his part, agrees to give security for the performance of his contract, which is a mortgage upon the negroes bought with the $100,000, and his other property in possession.

Is it not clear, from the agreement, that the covenants and agreements on the part of the company and Petrie, are independent of each other? If they are, Petrie would be authorized to sue for the money before the completion of the work, or without any amount of performance, or offer to perform.

The *rule on* the subject of covenants is, that when the payment of the money is to be made, or may be demanded, before the performance of the work, then the covenants are independent; but where both are to be performed on the same day, or where one or both of the parties are to do a certain act, upon performance of the other, then the covenants are dependent; one is not authorized to demand performance by the other, in whole, or in part, without performance on his part, or offer to perform.

In construing agreements, with a view to ascertain whether covenants are dependent or independent, the intention of the parties is to be carried out, and whatever that intention is, whether provident or improvident, it is to govern. They have a right to contract in such manner as they may think proper, and whatever agreement they make, the courts will enforce, unless the agreement is made in fraud.

In the case of *Cunningham* v. *Morrill*, 10 John. R. 203, the Supreme Court of New York lay down the rule as has been stated, and the case throughout sustains the positions which have been assumed. It is true, in that case, the Court decided that the party could not recover the whole price agreed to be given, without performance on his part, because the agreement was, that he was to receive the money, in proportion to the work actually done, and said, that parties "have a right to mould their agreements so as to suit their mutual convenience and interests, and when the courts can ascertain their meaning, they are so to construe the contract as to give effect to that meaning, provided the purpose be lawful." There

is not one word or letter in this agreement or contract, which leads to the construction, that the money, or any portion of it, was to be retained, until the completion of the work, by way of security for the performance ; but, on the contrary, it was left with the contractor, to determine when he might receive the money, and a mode of security, other than that afforded by the withholding the money, was provided, to wit, a mortgage upon property, upon the well known rule, that the inclusion of one thing is the exclusion of another.    The providing one mode of security was to the exclusion of the other, like upon the sale of real estate, if security is given for the purchase-money, this excludes the security provided in equity by a lien on the property sold.

Petrie, then, was entitled to recover the whole amount contracted to be paid him before the completion of the work, in order to enable him to perform his contract.    Did he receive this amount ?    It is insisted that he did not.    The exhibit to his answer shows, that up to the 18th day of November, 1839, which was rather more than nine months after the contract was to be performed on his part, he had received in sums from time time, running through the whole period of the thirty-three months which had elapsed from the making the contract, the sum of about two hundred and ninety-eight thousand dollars : from which sum was to be deducted the sixty-six or seventy thousand dollars, to be paid, and which was agreed to be paid by the railroad company, either on account of the bridge company or for themselves, having taken upon themselves the contract : from which was also to be deducted the losses which were from time to time sustained by Petrie on the Brandon Bank paper ; he being compelled to use it at a loss in his operations, and the company, as is proved by the witnesses, having failed to pay him as agreed.    Their agreement was to pay money; and he was compelled, because he could do no better, to take Brandon money.    In other words, when he had the agreement of the company to pay, because they could not pay, he was compelled to take their other agreements in lieu thereof, in the form of bank notes, to pay on demand ; and, because it was known that these notes would not be paid on demand, a loss on their use was sustained ; and this loss he was entitled to have made up to him, and it was agreed to be made up.    This was

nothing more than equitable.   Taking these deductions, the whole amount to be paid within two years was not paid, or even up to the time of the settlement, on the 21st December, 1839.  Thus far, and up to this time, the company had not performed their agreement. How, then, was it, on the part of Petrie?  Did he perform his part of the agreement?   Was he in default?   The proof is, that he commenced work immediately after the making the agreement, and continued to prosecute the undertaking until he was arrested in his progress by the owners of the land over which the road passed, who had not relinquished the right of way; and, during the progress of the work, he was hindered and delayed from time to time, by the company failing to furnish him with par funds, with which to buy iron, engines, &c.

But the $125,000 in Brandon money, paid to Petrie, is a great bugbear, and he is charged with it ; and by this item the enormous amount is made out, with which he is charged on the other side. Under what circumstances did Petrie receive this amount?   The iron had been ordered ; had been shipped from Liverpool ; had arrived in New Orleans, and had been attached by the creditors of the company in New Orleans.   The road could not be completed without it, but with it, in two months could be finished.   Under these circumstances, on the 18th day of November, 1839, the company sent Mr. Petrie to New Orleans, to endeavor to release the iron, and gave him the $125,000 of Brandon money, and directed him to use it at what discount he could.   He accounted for it at eighteen cents in the dollar ; but has never been enabled to use it at that price : and a part at ten cents in the dollar ; and yet has on hand of it, the sum of $90,000 ; so that there is nothing to be made out of this, to show that Mr. Petrie is in default.   Is it not also proven, that Mr. Petrie was compelled to stop work, in consequence of a want of way by Washington, Gardner, and Hathorn? It is.   As to Gardner and Hathorn, the proof is conclusive.   But it is insisted on the other side, that the deposition of Washington proves only an objection on his part, in December, 1839, after Petrie had ceased to work on the road.   That objection, however, shows there had been no relinquishment of the way, and from the beginning, Mr. Petrie had been a trespasser.   Mr. Petrie made no

contract, that he would prosecute the work at all hazards, whether the right of way was relinquished or not. He was not bound to subject himself to the liability to be sued for a trespass, or when sued for a trespass committed, to other actions for a continuance of such trespass; and there being difficulties on the subject, as is proved by the testimony of the witnesses, and by the record in the suit, *Gardner* v. *Petrie, et als.*, filed in the paper, he was bound to desist, and did suspend operations, in consequence of such difficulty, which is not to be attributed to him as a fault, but the fault is on the other side.

Mr. Petrie having suspended operations, insisted that he had been injured by the company; a meeting of the directory was had on the 21st day of December, 1839, before whom he (Mr. Petrie) appeared, made a representation to them, of the damages which he had sustained, by default of the company, and asked compensation. The company would not agree to all the estimates made, and refused to allow them. Mr. Petrie left them, — was afterwards sent for, by the company, when *it was proposed by the company*, that they would release and *discharge* him from the contract, give up any balance which might appear to be due from him, and release the mortgage given by him, provided his brother, F. H. Petrie, would agree to complete the road for $15,000, and he (Petrie) would be the security of his brother, for the performance. To this, after some hesitation, he agreed, and it was done accordingly. In reference to this agreement, that it was made in good faith, without fraud, or thought of fraud on either side, is manifest from the testimony in the cause.

After this review of the agreement, its construction, and the manner in which it was performed, how it is possible to be said, that Petrie forfeited the agreement, we cannot conceive. It is most manifest, even if there was any doubt whether Petrie was, or was not, in default, that he, in good faith, thought he was not. But that the other side was, and so to some extent, thought the directory, and about that there was a difficulty, and this difficulty settled by compromise, and the agreement and everything under it was discharged.

[An order to take the testimony of Messrs. Shelton, *et al.*,

was made by the Court, as will be seen by looking at the records.]

But suppose the complainants have made out that Petrie has forfeited his contract, and by consequence the condition of his mortgage given by him to the company, conditioned to secure performance of the contract. The question which then arises, is, whether the complainants are entitled to the benefit of the forfeiture, produced by that non-performance.

1. The complainants are not entitled to the relief asked; because they have come into this Court without having exhausted their remedy at law. The rule on the subject of the kind of relief, asked for by this bill, is, that the party has no title to the relief he asks, until he ascertained, by an execution returned *nulla bona*, that the remedy is exhausted at law. No state of facts will excuse such a return. See 9 Wendell, 548, *M'Elwain* v. *Willis*. See also 3 J. J. Marsh. 63 ; 1 Dana, 516 ; 2 idem. 98 ; *Binkerhoff* v. *Brown*, 2 John. Ch. R. 671.

The bill does not allege that a *fieri facias* had been returned *nulla bona*, nor do the complainants that the fact is that no goods and chattels can be found. It is sought to avoid the force of this objection,

1. By insisting that the defendants having answered, without objection, that it is too late to make the objection. The case of *Edwards* v. *Bohannon*, 2 Dana, 98, above referred to, was a bill in which the complainant endeavored to reach an equity ; and he failed to make the allegation of, execution returned *nulla bona* ; answer without objection, on that account. Yet the Court said the averment must be in the bill, as it was a part of the complainant's *title*.

2. The complainants say, true, we have not made a direct averment of a return of *nulla bona*, yet we have referred to an exhibit ; and, by reference to that, it will be seen, that there was a return of *nulla bona*, before filing the bill. It is answered, that the mode of making the exhibit is this, the judgment is marked D, and the executions *hereinafter mentioned* are marked E, and none other are thereinafter mentioned, except the executions levied on the property in dispute ; and the execution, upon which the return

is said to have been made, is nowhere mentioned.    Again, the object of a return of *nulla bona*, is to show that the remedy is exhausted at law.   If the execution insisted upon as an exhibit is so considered ;  then all other  executions, with the record, will be so considered, and then it will appear, by a subsequent execution, that the right of the  company  on  the strips  of land, from  Jackson  to Brandon, one hundred feet  each side  of  the road, was levied on, together with the road, and the road  sold, but not the land, and for · everything which  appears  in  the  record  the  same  is yet unsold, and may satisfy the  execution,  in whole or in part.    It is not, and was not true, therefore, that the remedy at law had been exhausted. Again, we say the complainants are not entitled to the relief asked, because, by their own showing, they have had an execution at law, levied on  the negroes  in  contest ; that a  bond has been given by defendant Petrie, to try his right, and for that purpose, an issue has been made up,  and  is  now depending  in the  circuit  court for the county of Rankin.   The complainant, in making that levy, went upon the  ground, that the  property was in  the  Mississippi and Alabama Railroad  Company, and  they now insist it is in the company, because  a mortgage was given  to  the company, conditional for the completion of the  work, and the *condition* being forfeited, the estate is absolute in  the  mortgagee, and therefore the property was subject to execution against the company.   This would be the law, if such were the  facts, and they are admitted to be so for the present, for argument.   Upon what ground, then, is it, that the complainant has come  into this  Court ?   If. it was for discovery in aid of the  proceedings at law, the discovery is  or is not obtained. The answers have been  filed, and there is an end of the suit.    If it is for discovery and relief, the  answer  is, that he has no right to press his  execution at  law,  and  come into this Court also.   The proceeding  under  the  execution,  by which  the  issue at law was made up,  must be to the  exclusion  of other proceedings at law, in chancery,  or  elsewhere.    Because the whole  proceeding contemplates a settlement of the  rights of the parties in that mode.    See Revised  Code,  201,  sec.  25, 26 ;  Laws  Miss.  Ed.  1838,  341, 342, 343, &c., Nov. 1830, ch. 78.

The act of 1830, sec. 3, in the last clause of the section, settles

this matter beyond a doubt : " and the final judgment given on any such issue, shall have the like effect on the rights of the parties to said issue, as such judgment would receive if the same had been given in an action of detinue." That effect is final and conclusive; and in order that there might be no conflict or difficulty upon the execution, all proceedings, as to so much as the value of the property levied on, are to be suspended until the issue is tried. The execution is then in operation as to the value of the property levied on, as to other property — operates on that *only*, until the trial of the issue ; and, as to that, cannot be returned *nulla bona ;* and the property must be protected in the hands of the person giving the bond, because it is in the custody of the law. See *Hagan* v. *Lucas*, 10 Peters, 400.

But this matter must be placed upon the same footing it would be were an execution taken against the body of a defendant, against whom a judgment was rendered, and by virtue of that execution the defendant was arrested and in custody. While the defendant is so in custody, the creditor would not be permitted to file a bill to reach the equitable estate of the defendant. See *Smith* v. *Smith*, 1 Paige, 391.

The reasoning that applies to the one, applies to the other ; it is, that the remedy at law is not exhausted. The body in the one instance, and the property in the other, being taken, there is no title to come into equity until the levy on execution of the body is disposed of, and the Court can ascertain whether anything and how much can be made at law.

Again, if the railroad company have a right of action against Petrie, what is the nature of that action ? It is a right to recover damages which are unliquidated, for the breach of a contract, upon which the company would be authorized to bring an action of covenant. The amount of the recovery would depend upon the state of the facts proved ; and various circumstances might exist to increase or lessen the amount. There is no right to any certain or definite sum ; but the amount would rest in the discretion of a jury. Can there be any case found in the books, where, in such case, the creditor has been substituted to the right of the debtor ? None can

be found : no cases can be found, except where an account taken by a commissioner would ascertain the amount due.

Again, we insist the complainants have shown no right, because, before they filed their bill, or before any act was done showing their intention to come into this Court, the right which it is said the Mississippi and Alabama Railroad Company had, by reason of the supposed forfeiture, was released and discharged.

If such was the fact, there is an end of this suit: for it has been repeatedly held, in the courts of the first respectability in the United States, that the right only vests from the date of the filing the bill, or issuance or service of subpœna, or from the time that some act has been done known to the parties on the other side, evidencing an intention to come into equity. See *Hadden* v. *Spader*, 20 John. 554 – 556 ; 5 John. Ch. R. 280 ; *McDermott* v. *Strong*, 4 John. Ch. R. 687 ; *Edmeston* v. *Legae*, 1 Paige, 637 ; *Beck* v. *Burdett*, 1 Paige, 305 ; *Weed* v. *Pierce*, 9 Cowen, 722.

But, to relieve themselves from this difficulty, the complainants' counsel insist, that the settlement and discharge of the assignment were made in fraud of the creditors, and therefore void. The proof is, that there was no fraud in any manner intended, but a difficulty and dispute existed ; one party making a large claim for damages, and the other insisting he was not entitled to the extent he claimed : and, to settle this difficulty, it was agreed that a compromise take place ; and Petrie was released and discharged from the contract, and the difficulty thereby settled. And now, although it is admitted no fraud, in fact, was committed or intended, yet, the facts and circumstances prove fraud in law ! If the counsel on the other side can make fraud in fact or in law, out of the circumstances, I freely admit his acuteness.

Again, it is insisted on the other side, that the release and discharge of Petrie from his agreement, was not made by writing, or under the corporate seal of the company ; and therefore is as if it was not done, and the contract is still subsisting, and in full force. The conclusion by no means follows from the premises, because,

The directory acted upon the release and discharge as effectual, by permitting F. H. Petrie to act under the new contract with him ; and it certainly cannot be true, that a contract can subsist and be in

force, binding both upon the defendant in this case and upon F. H. Petrie. But the premises are not true from which the conclusion is drawn. It is admitted that the old common-law rule was, that a corporation aggregate could not act, in making a contract, but by its seal — such, however, is not the modern rule. A corporation may act by its officers and agents, in writing or by parol ; and by those agents may make any contract or agreement, and release and discharge any such agreement, as individuals might do. 2 Kent, Com. Am. Law, 232, 233, 234, 235. The contract under consideration was made with an agent of the company, to wit, William H. Shelton, the president ; and all matters in reference to it were settled and arranged with the agents, the president and directors, at a meeting of the board. They were the persons to represent the company, and the acts done by them were as binding upon the company, as such acts would have been upon individuals. What would have been the effect of the transaction between the directory and Petrie, on the 21st December, 1839, on individuals ? It would be considered, if to go no further, as a waiver of the agreement. See *Bottsford* v. *Burr*, 2 Johns. Ch. R. 160.

It will hardly be contended, that it was not competent for the president and directors (who were the persons established by law to act for the company, and they being the only persons and the only means through whom the corporation could act), for a consideration, such as a compromise of difficulties, to give up, by parol, a debt or demand which they had against Petrie. What took place was, therefore, if nothing more, a waiver of the contract, and a release to Petrie, of the amount which was claimed against him as overpaid on that contract.

From all of which we come to the conclusion, that the complainants are not entitled to the benefit of the forfeiture claimed. But suppose all the considerations already urged do not operate, what decree will the court render ? No account can be taken, because the claim of the company on Petrie is not a matter of account, — but a claim for unliquidated damages, arising upon an agreement not performed ; and the mortgage wished to be set up, being conditioned for the performance of the contract, can any precedent be shown of an award of an issue in such case of *quantum damnificatus ?*

Should the Chancellor come to the conclusion, that the views taken in the foregoing argument are not correct, then we insist that no decree can be rendered against Petrie, having an effect different from one which would be rendered against him, in favor of the bank. The suit was commenced in December, 1840 ; by the act of 1839, Petrie had a right to pay anything which he owed the bank in their paper, which he is ready to do, if he owes anything ; and the object of this bill is, to place the complainants in the situation in which the bank was, and confer on them the rights which the bank had.   If the Chancellor decides that the complainants have a right to be substituted to the rights of the bank, we are willing to pay them what we were bound to pay the bank, and no more.   See *Union Bank of Tennessee* v. *Bank of Maryland*, 7 Gill and Johnston, 305.

*W. Yerger*, for defendants, on the same side.

1. The directors of the company had the right to make a contract with Petrie to build the road.   See 11th section of charter, act of 1836, p. 157.

A written agreement, whether under seal or not, though it cannot be added to or raised by parol, may be dispensed with or discharged by a subsequent parol agreement.   9 Pick. R. 298 ; 3 Johns. 528 ; 13 Wendell, 71.   It has never been doubted that a written agreement may be dispensed with by verbal contract.   Chit. on Con. 88.

A corporation may bind itself by a parol or verbal contract, in the same manner and to the same extent that an individual may, and an agreement made by vote of a majority of its directors is valid, whether recorded or not on the books of the company, or reduced to writing or not.   Angell and Ames on Corporations, 121, 122 ; ib. 165 ; *Fletcher* v. *U. S. Bank*, 8 Wheat. 357 ; Angell and Ames on Cor. 117, 127 ; 2 Kent's Com. 233 ; 12 Wheat. 68.

Corporations, like individuals, are bound by the acts of their agents, when done within the scope of their authority ; and the acts of the directors of the company, appointed to manage its concerns, are obligatory upon the company, when made in good faith and within the power conferred upon them.   Angell and Ames on Cor. 170, 171.

When a corporation aggregate is created, and the management and control of its business is in the hands of the directors, the latter become the agents and trustees of the corporators ; and a relation is created between the stockholders and those directors, who, as trustees, become accountable for dereliction of duty and violation of trust. 1 Edwards R. 84 ; 1 Edwards R. 573.

Directors are not accountable for anything more than a diligent attention to its concerns, and a faithful discharge of their duty, and are not liable, personally, for errors of judgment, nor unless there has been negligence and fraud. 1 Edwards R. 513.

It is true, that the capital stock is a trust fund for the payment of debts, and that the stockholders cannot discharge themselves from it, while there are notes outstanding and unpaid ; but the conclusion does not follow, that because the creditors of the company may look to the stockholders for payment, to the amount of their stock, that they have a right to set aside contracts and settlements made with the agents or directors of the company, upon the ground of extravagance, recklessness, or want of prudence. In this particular corporations are like individuals. If the agents of an individual make an extravagant or reckless bargain, if within the scope of his authority, the principal is bound by it, unless made in fraud, or the price be so grossly inadequate as to be evidence of fraud. But in no instance can the creditor of the principal rescind the contract, unless made with an intention, on the part of the principal or his agent, to defraud the creditor. 6 Call, 308 ; 6 Johns. Ch. R. 111 ; 3 Cowen, 445 ; 2 Leigh, 149 ; 3 Mason, 308.

A failing debtor has a right to prefer one creditor over another ; and though dishonest in the debtor, it is not in the creditor. 1 M'Cord, Ch. R. 100 ; 7 Peters, 608 ; 1 Eq. Dig. 371.

The mortgage, if forfeited, could only be foreclosed for the damages that the company have sustained by the failure to complete the road, and these are as entirely unliquidated as the damages which a party sustains in an assault and battery. I do suppose that the idea, of filing a bill to foreclose a mortgage for unliquidated damages, never entered into the mind of any person before this bill was filed. But that a creditor of the injured party may file the bill, is carrying the principle to a still more ridiculous extent.

It is a rule in equity, that time is not of the essence of contracts. In this case, as Petrie has performed, faithfully, a large part of the work agreed upon, and as he would certainly have performed the balance, if the right of way had been furnished, this Court would not decree a foreclosure and sale, but might, on a bill properly found, decree a specific performance on the part of Petrie.

*George Adams,* on the same side.

If Petrie. broke the contract or condition of the mortgage, between him and the Mississippi and Alabama Railroad Company, that breach was stopped, and all right to damages waived and extinguished, by the *subsequent* and final settlement between the contracting parties, and the acknowledgment of indebtedness to Petrie upon that settlement ; the delivery of the mortgage to Petrie, and the contract between the company and Frederick Petrie for the completion of the railroad.

If the railroad company failed to comply with the contract on their part, as the testimony shows they did, they could not, nor can any one in their right, enforce a specific performance of the contract on Petrie's part, or foreclose the mortgage for a breach of any of its conditions by Petrie, or recover damages for any failure on his part.

If there was no waiver of the breach or release of the mortgage, by the railroad company, the mortgagees could claim *damages only* for the breach ; and upon a bill brought by the mortgagees to foreclose, the Chancellor would do no more than order an issue of *quantum damnificatus.*

It is a rule of the courts, both of law and of equity, that fraud is not to be presumed, but that it must be established by proofs ; there is no proof of fraud in this or any transaction between Petrie and the railroad company, but, on the contrary, the testimony in the cause clearly proves a full, fair, and final settlement between Petrie and the railroad company ; the delivery of his mortgage to Petrie, which remained in his possession and was filed by him with his answer, and the testimony, also proves, that the railroad company discharged William Petrie from his contract for completing the railroad, and made a contract with Frederick Petrie, to finish the rail-

road ; all these facts are stated upon oath, by men who are known to the Chancellor, and whose testimony, if *human* evidence can establish anything, must satisfy the mind of the Chancellor, that the property in controversy is not subject to the claim of the complainants ; but the complainants, from the hopelessness of their chance of obtaining anything from the railroad company, and relying, no doubt, upon the general odium and suspicions against the managers of the affairs of that company, have made this desperate and forlorn attempt to subject Petrie's property to their claim ; had the case been one between A. and B., so desperate an attempt would never have been made, nor would it have presented a difficulty or doubt, to any legal mind.

I will not undertake to name the witnesses, whose testimony I rely upon, or detail the facts stated by them, but will barely refer to their known character and intelligence, and the amount of their testimony ; nor will I enlarge upon, or attempt to illustrate, the legal positions I have taken : they have been selected from many others, that arise in the case, as points on which I wish to place the Chancellor's mind, and from which he will readily and clearly perceive every reason in support of them within the legal horizon.

I have not stated the point, or referred to authorities, to show that the satisfaction, release, or discharge of a mortgage, may be proved by parol evidence ; that point *is* taken, and authorities referred to, by other counsel, on the same side with myself, and so say the best modern authorities.

*George S. Yerger*, on the same side.

*Quitman* and *McMurran*, for complainants, in reply.
The bill is framed with a double aspect.

1. To remove the obstructions of apparent legal titles, and establish a resulting trust in favor of a judgment creditor.

2. To enforce a specific equitable mortgage, and thus subject mere equitable assets to the claim of a judgment creditor.

The defendants have presented labored arguments, to show that the bill itself is defective for these purposes, and that no relief can be granted thereon ; but while these objections are urged in argument, the pleadings, carefully made up, evince, that the able counsel

were not willing to rest their cause on them. They have *answered fully*. Why did they not demur?

The answer of Petrie is not only full, but it expressly invites the full investigation of this Court. It contains the strongest possible agreement, to make this Court the arbiter of the merits of this controversy.

We are aware of the decisions of this Court upon the subject of its jurisdiction on creditors' bills, to which an answer is put in; yet, we respectfully suggest, that this does not come within any of the objections laid down by this Court, to granting relief in cases where no return of *nulla bona* appears. Here, there is an admission of entire insolvency, an agreement to submit the merits. The subject-matters being the declaration of a resulting trust, and the foreclosure of an equitable mortgage are properly of the jurisdiction of a court of equity. The objection then, in argument, is merely technical, and comes too late, after full answer.

In the present case, the objection is the more remarkable, because the principal defendant, Petrie, has really brought us into this Court. He first filed his bill to restrain us from levying on and selling the property claimed by him, under our execution. Wright and others complainants, plaintiffs at law, then filed their bill as aforesaid, and also answered Petrie's first bill, praying, that the bill secondly filed, might stand; might be taken as part of their answer, and stand as a cross-bill. The causes were then consolidated, and are now submitted together. (See the agreement between counsel, on file among the papers.)

This case is further distinguished from the cases above alluded to, decided by Chancellor Buckner, in an important and essential feature. The bill seeks only to subject property which has *been levied on, by the execution at law*, and about which an issue to try the right of property had been made up. The creditor, under his judgment, levied on the property, as that of the bank. The claimant Petrie, came in and interpleaded. On this intervention, finding that he may have a bare legal title, and that the interposition of chancery is necessary to settle title, we have sought it in relation to the right of the property levied on. In the case of *Perry* v. *Nixon*, 1 Hill's Ch. 335, it is laid down, that a creditor,

Wright, et al. *v.* Petrie, et al.

who has obtained judgment, and sued out execution, and levied it on property, of which the debtor has the equitable but not the legal estate, is entitled to the aid of a court of equity, to make the property available in payment of his demand. See also *Harrison* v. *Battle*, Dev. Eq. 537 ; 1 Paige, 305 ; 4 J. Ch. 687; 10 Yerg. 317.

We have taken these views of the case, because the point has been pressed with such zeal by the opposite counsel; we, however, believe them entirely unnecessary. The bill exhibits the judgments and executions, and avers the total insolvency of the defendants at law. Those records are parts of the bill. They are also proper proofs under the bill and charge of insolvency, and in this state of the pleadings.

These records show, that executions upon both judgments have been returned *nulla bona*. We present an analysis of them, in statement A, annexed to this argument. It is true, that a technical exception is made ; that there still appears to remain levied on, and undisposed of, a strip of land on both sides of the railway. This is truly a mere technical shadow, and readily answered. The road or railway could not properly be levied on at law, or sold. If, however, anything passed by the sale of the road, it carried with it, and also disposed of, the strip of land on both sides, necessary for its enjoyment. It is, indeed, the land on which the railway is laid ; by reference to the charter of the Brandon Bank, this strip of land on both sides is appurtenant to the railroad, and entirely dependent upon its continuance. It would revert to the original proprietors, upon the expiration of the charter, by non-user. The charter has expired, being repealed by consent of the company. The fair intent of the sheriff's return, is, however, that the railway sold, included the strip said to be levied on. The Chancellor, in the absence of any point made thereon in the pleadings or proofs, will so construe it, if necessary.

But it is urged in argument, that the same exhibits which show a return of *nulla bona*, also show that subsequently other property was levied on, and that we cannot come into chancery, until that also is exhausted. This objection comes irregularly from one, who by his original bill, his oath on his claim of property, and his an-

swer, in the latter case, sets up a claim, both legal and equitable, to all the property which appears to have been levied on, and is now undisposed of. The saw-mill tract, and the slaves levied on, are all absolutely claimed by Petrie, and the object of these proceedings is to submit the equitable and legal claims of both parties to the Chancellor.

If the rule be so stern and unyielding, that a return of *nulla bona* must be shown, even where total insolvency of the debtor is alleged and admitted, that it cannot be resisted, it should, like every other rule not founded in reason, be regarded as merely technical, and a technical compliance be deemed sufficient.

In this case, the bill, answer, and proofs, all show utter and hopeless insolvency. It has become a part of the history of the country; a dark page upon its leaves. It is recorded upon the statute book, by the act repealing and annulling the charter of the Mississippi and Alabama Railroad Company.

Complainants, therefore, are now properly before the Court as judgment creditors, seeking to subject the equitable assets of their debtor, an insolvent and defunct corporation, to their just demand. 20 John. R. 554 ; 2 Paige, 567 ; 2 Stew. 378. And if it be found that the bank had any rights against Petrie, not legally or equitably parted with at the time of the judgment, we are entitled to subject them to our claim.

Before we leave the points 'made, on the structure of the bill, and the right of relief, we will refer the Chancellor to the several prayers of the bill, in answer to objections made on that score. It is true, that the specific prayer for foreclosure of the mortgage is contained in the body of the bill, but we believe it is considered by the most technical pleaders that the prayer may be inserted on any page of the bill.

We have before stated, that the bill has an alternate object, either to declare a resulting trust, or to foreclose a mortgage. A resulting trust in the personal property, may arise either from the purchase of the slaves with the money of the company, and a breach of the condition of the purchase, or from a forfeiture of the mortgage.

At law it is said, upon a forfeiture of a mortgage, personal estate

mortgaged becomes absolute in the mortgagee. The same rule should apply in equity ; where an equitable mortgage exists on personal estate, a resulting trust vests in the mortgagee on forfeiture.

It will not be denied, that the contract here, was intended and will be held to have been an equitable mortgage, on the property of Petrie, and especially on the slaves purchased with the advance. The condition was a faithful compliance with the contract. For this the mortgage was to be given. Upon a breach of that contract, the forfeiture took place, and thereupon a resulting trust arose, to which we are subrogated.

In either aspect of the bill, whether a resulting trust arise, or whether we look to the foreclosure of the mortgage, the non-performance of the contract by Petrie, or a breach of the condition, is an essential fact. The mortgage was to be given as a security for the performance of every duty that might arise out of the contract, expressly or constructively, and consequently if Petrie has committed any breach of the contract, by which the bank was injured, or has received advances which he has not returned or duly appropriated ; if, indeed, upon settlement, the balance was against Petrie, the breach of the condition of the contract is consummated.

To determine whether Petrie has performed his part of the contract, we must examine it. What was the leading object of the agreement ? Certainly, it requires no argument to show that it was entered into for the purpose of insuring the completion of the railway in two years from the date of the contract.

The charter of the company required this to be done ; and its corporate powers were hazarded on the faithful compliance, on the part of Petrie, with the terms of his contract. The sum to be paid was designated with sufficient certainty, and the time of payments fixed. No security, whatever, was demanded but the mortgage.

More than three years had elapsed since the execution of the agreement, and before the filing of this bill, and yet the work is not done. So far from being completed it is abandoned, and what has been done gone to decay. Neither the company, nor the

public, have ever derived any advantage from the work, notwith-standing the heavy advances made.    The defendant Petrie is the sole gainer ; on these advances he has acquired opulence.  Why has the work not been completed ?   What excuse has the contractor ? He presents, in substance, the two following : —

1. That the company failed to comply with their agreements, and that, thereby, he was prevented from discharging his.

2. That, upon final settlement, he was released by the company from all demands on the score of his contract.

We insist, that, upon a fair interpretation of the agreement, the proofs show no default, in the company, of which he can avail him-self ; and that the alleged settlement and release are void, as to cred-itors, being without consideration, and fraudulent.

A brief examination of the points of defence set up will show that they are not tenable.

The defendant insists that the company failed, in two particulars, to comply with their contract.

1. In not making the advances, and furnishing the means to com-plete the work.

2. In not procuring the right of way.                .

To understand the obligations of the company, arising out of the agreement, we enumerate them.    They agree, in consideration of the covenants of Petrie,

1. To pay Petrie $204,000 for completing, and putting into com-plete operation, &c., the road from Pearl river to Brandon, and two dollars per cubic yard for the excavation of any rock he might encounter.

2. $20,000, within one month after the commencement of the work, and then in payments, at intervals of about thirty days, as the money might be required by Petrie for the prosecution of the contract, &c.

3. To invest Petrie with authority to draw bills on the bank for $100,000.

These constitute all the engagements of the company which can be drawn from the contract.   Were they complied with ?

It is admitted, the bills were drawn and accepted.   To that ex-tent the payment was made on the contract.   The work was com-

Wright, et al. *v.* Petrie, et al.

menced about the month of April. The balance, which would be due to Petrie on completion of his contract, over and above the advance of $100,000, would be $104,000. Supposing him to be entitled to draw this, monthly, during two years, under the contract, he would have been entitled to receive about $4300 cash, in every month. Now the proofs show that he had received, besides the advance on the 1st May, 1837,

|  |  |  |  |
|---|---|---|---|
| advance on the 1st May, 1837, | | | $5800 |
| In May, | 4000 | in all | 9800 |
| " June, | 10,000 | " | 19,800 |
| " July, | 5140 | " | 24,940 |
| " August, | 2000 | " | 26,940 |
| " September, | 3000 | " | 29,940 |
| " October, | 3000 | " | 32,940 |
| " November, | 10,780 | " | 43,720 |
| " December, | 6050 | " | 49,770 |
| " January, | 47,400 | " | 97,170 |
| " February, | 1000 | " | 98,170 |
| " March, | 24,100 | " | 124,270 |
| " April, | 12,600 | " | 136,870 |

Admitting that the excavation of rock would add to the original contract price the sum of $8000, the whole sum to be paid by the company to Petrie, beside the advance on drafts, would be, on completion of the contract, . . . . . $112,000

Now he received, during the *first year* of his contract, 136,870

Being more than the whole amount which would be due, $24,870

These calculations, founded upon the proofs furnished by defendant himself, show, conclusively, that there is no pretence for his assertion, that the company failed to make the necessary advances or payments to enable him to complete the work. Besides, there is not one word of proof, that he, even during the first year, made any requisition for money which was refused. Had he sought to protect himself from liability for non-performance of his duties, he should have shown a positive refusal, on their part, to pay the necessary amounts, after he had formally demanded them. But it appears, that, during the first twelve months after he had commenced the work, he was paid a large amount over and above the amount

which he could have charged, had he completed the work, furnished the iron, and supplied the locomotive, cars, &c. &c.

His defence, on the ground that the company failed to procure the right of way, is equally weak.

By the charter of the company, Petrie, as the agent of the company, was invested with all its powers and authority to procure the right of way: under his contract he was bound, equally with the company, to use the means in his power to effect it. It does not appear that he made any effort so to do. This, however, is readily accounted for. In truth, no hindrance was made until the winter of 1839. The contractor, according to his own answer, and the proofs, had been in peaceable possession of the whole way for two years from the making of his contract. The very fact of actions of trespass being instituted against him, in the latter part of 1839, shows that he was, up to that time, in the occupation of the track of the railway.

The company, then, were not in default. Now, what were the engagements of Petrie, under the contract? They were,

1. To put the road in complete operation in two years.

2. To purchase slaves with the advance of $100,000, and employ them on the road.

3. To furnish all materials, including the iron.

4. To furnish a locomotive and tender, and eight cars.

5. To use diligence and energy in the prosecution of the work.

6. To pay damages if he failed or did not perform his contract.

7. To mortgage all his property for the faithful performance of his contract.

From the proofs, it is manifest that he has not performed any one of these agreements but the second.

Upon this agreement or contract, there can be no doubt, that, if overpaid, he was liable to refund the surplus. Surely, the mortgage required by the contract was to be a security for such advances.

We cannot doubt, then, that the Chancellor will find that the company have not failed to comply with all the engagements they had entered into, and that the failure has been entirely on Petrie's part. It appears from the proofs, that the contractor has altogether

received about $390,000, when the whole amount he could claim, upon a full compliance with his contract, would be no more than $212,000.

He has furnished nothing on his contract, and is liable for the whole amount received by him.

The abstracts, briefs, and calculations, submitted by Cocke and Evans are referred to, and exhibit fully the results drawn from the whole testimony.

The second point of Petrie's defence is the alleged settlement and release.

It is well settled that a debtor, in insolvent circumstances, and more particularly one against whom judgments have been obtained, cannot give away property without consideration, nor release rights of action, legal or equitable. It would be deemed fraudulent and void as to creditors, even though no circumstances of fraudulent intent should be shown. The creditor has a right to inquire into the fairness and sufficiency of the consideration received, and if found unfair or insufficient, it will be set aside, and the debtor required to pay over what was really due to the creditor. The general principle is, that an insolvent debtor cannot release claims of any kind, without receiving a full consideration therefor.

The testimony in this case does not show a formal release. There is no testimony to prove any change in the contract, from the day of its execution. Where is the evidence of any change made in this formal, written agreement between the parties? It is the act of a corporation, made by competent authority. It is not pretended that there exists any formal or record evidence of any alteration having been made in it. The mere occasional statements of directors, or admissions made by them, individually, and not in their corporate capacity, cannot be received as evidence of a corporate act. Corporations act only by votes and resolutions. It would be extremely dangerous to admit the private, unofficial, and unrecorded declarations of directors, to stand as the evidence of solemn contracts; and much more, to permit such loose declarations to prove releases from contracts in writing, deliberately and solemnly made. All testimony of this character should, therefore, be discarded. We

are, then, left with no proof on the subject of the release, but the resolutions of the board, passed Dec. 21, 1839. (See them.)

These resolutions do not profess to release Petrie from any existing claims, arising out of the contract, except that of furnishing the locomotive. They do not pretend to state that any settlement had taken place. No evidence of a settlement appears to exist on the books of the bank. There is no record of it. There is no release from the original contract. Give these resolutions their full weight, and they could not be construed into a release of the existing claims of the company against Petrie. But the resolutions, on their face, show fraud. Petrie is released from furnishing a locomotive, and instead of being charged therewith, he is directed to be credited with the price. The cashier is directed to cancel the mortgage of record on the books of the bank, without any reason assigned, and without any consideration expressed. It is recited that the company are under obligations to furnish Petrie with a certain amount of par funds. This recital is false. It is so shown to be by the books of the bank, by the contract, and by the proofs.

It must be evident that this alleged settlement and release, which it is pretended were consummated by these resolutions, although they are at variance with the proofs introduced to support them, was an effort to screen Petrie from responsibility to creditors, and thus to consummate the series of frauds which the directors of this bank had practised upon a credulous public.

But little longer than a year previously to this pretended settlement and release of Petrie, these directors had invited the scrutiny of the bank commissioners. They caused to be published a report, in which it was represented that the bank had available cash resources to the amount of many millions. It is known that, after the publication of that report, their circulation increased, and few, if any, of the liabilities of the bank had been redeemed. Yet, in the short space of about a year, they represent themselves unable to meet *small* advances in par funds. The object of this report was, to give confidence to their issues, and to extend their credit. The country was duped by these false representations. Petrie appears to have aided in the fraud. He furnished a statement (see his letter to Shelton), in which he represented the investment of the com-

pany in the railway, on the 2d of August, 1838, to be $239,035. He afterwards saw this representation go to the world, without contradiction, knowing its object, and, by his silence, assenting thereto. He knew also of the sale a short time afterwards, by these very directors, of large sums of their own money for less than half its nominal value ; according to his own answer, he participated in it. It appears that within a short twelvemonth all these immense cash resources had vanished, under the superintendence of these worthy trustees ; that the duped public began to consider the issues of the Brandon Bank as almost worthless ; that the directors continued to throw them out, while they possessed any value, and were very lavish to Petrie ; and, in the latter part of 1839, after the judgments now sought to be enforced were obtained, it is proven that this bank was *insolvent.* At this time, when these trustees should have collected and husbanded the remaining resources of this bank, for the benefit of creditors, who had trusted them upon their public expose of abundant resources, they set about releasing themselves and their favorites from heavy responsibilities. The bare recital of the proceedings, which took place on the pretended settlement of Petrie's accounts, proves the recklessness with which they were disposed to throw away the assets still under their control. To give some color to their proceedings, they invite several respectable gentlemen to be present. Their testimony, however, shows they neither participated in the matter, nor understood it. The directors met; the settlement of an important account, involving $400,000, was before the directors. No communication in writing on the subject appears to have been made, no reference to a committee, no resort to books or accounts, no calculations made, and no cashier present. The unusual course of having the parties, W. and F. H. Petrie, present in person, was adopted ; no account current, no investigation, no record of settlement made ; not a paper exhibited, but the extraordinary "*proximate estimate,*" which bears upon its face the stamp of deception, and that not even preserved by the directors. Take these proceedings, in connection with the prior conduct of Petrie, in taking a release from all claims before his visit to New Orleans, to avoid garnishment as a debtor of the bank, in connection with the fact of his having amassed a large estate from small means, with the

then *condition of the company*, and who can for a moment doubt that these hasty and informal proceedings were devices to screen a debtor from the just claim of the creditors of the bank. If we now conclusively show, that double the contract price had been paid to Petrie, can it be supposed that the directors were not fully advised of the amounts which had been paid ? We will not dwell farther upon this pretended settlement. The falsehood and contradictions of the testimony, in relation to what was done, show the desire to screen Petrie, and exhibit and stamp the whole proceedings with fraud.

If this pretended settlement be set aside, or disregarded as fraudulent, or the pretended release without consideration, the original contract of mortgage remains in full force, and the only inquiry of the Court will be, what is now due thereon ? for this we claim a decree, and that the property mortgaged may be sold for its satisfaction.

By the CHANCELLOR. Although the papers in this case are very voluminous, and many points have been mooted by counsel on either side, yet its merits lie, comparatively, within a narrow compass. The complainants, as the judgment *creditors of the Mississippi and Alabama Railroad Company*, have levied an execution upon a number of negro slaves in the hands of the defendant, Petrie, in which they allege the said company has an equitable interest, which they ask to have applied to the payment of their judgments. The facts of the case are substantially these :

On the 23d of Feb., 1837, Petrie *contracted with that company to* construct a railroad from the town of Brandon to the town of Jackson, and agreed to furnish all the materials therefor, and also a number of *cars*, a locomotive engine and tender, and everything else necessary to the construction and finish of the road, and to put the same in complete operation, within two years from the date of the contract ; the company agreeing to pay him $204,000, at such intervals as the prosecution of the work might require. One hundred thousand dollars Petrie was to lay out in negro slaves, to work on the road, and was to give a mortgage upon them, and all his other property, as security for the faithful performance of his contract. The com-

pany also bound themselves to pay as an extra charge, not exceeding two dollars per cubic yard, for any excavation that might have to be made through rock. It appears, that Petrie purchased with the advance made to him by the company the slaves levied on by the complainants, and continued to work on the road, until, in December, 1839, at which time it is alleged, that by a fraudulent combination with the company, he abandoned the road in an unfinished and worthless condition, after having received more than the amount of money agreed to be paid to him, for the completion of the whole work, and for furnishing cars, locomotive, and other appendages necessary to put the road in full and complete operation. The complainants insist, that as to them, Petrie is still to be regarded as the debtor of the company, at least, to the amount of money received by him, over and above the value of the work actually done, and that that sum should be decreed to the satisfaction of their judgment, by enforcing the equitable mortgage growing out of the contract upon the slaves and other property. Petrie denies that he is in any way indebted to the company, or that they have any claim upon the slaves, and insists upon a settlement had with them, by which he is released from all liability on his contract, and the mortgage ordered to be cancelled.

The argument of counsel, upon this statement of the case, suggests the following questions for examination :

1. Whether, at the time of the alleged settlement and discharge, Petrie was really the debtor of the company.

2. Whether that indebtedness was released by the company without payment, and without any just consideration ; and if so, whether such release must not be regarded as fraudulent and void in law, as against the complainants, who were then the judgment creditors of the company.

3. Whether the nature of Petrie's liability to the company is of that character, which may be pursued in equity ; and, whether the complainants show a case which authorizes them to sustain such bill for that purpose. These inquiries will be disposed of in the order in which they are stated.

1. Upon the first question, it may be confidently stated, as the result of the whole testimony upon the subject, without going into a

critical analysis of the proofs, that Petrie had received, at the time
when he abandoned the road, and obtained a discharge from his
contract, a sum of money greater than the amount agreed to be paid
by the original contract, and, at least, equal to the additional sum
claimed by his answer, on account of his contract with the Jack-
son and Brandon Bridge Company, which he insists was assumed
under his contract for the construction of the railroad.    In the face
of these opposing facts, it is, however, insisted, that Petrie's fail-
ure to complete the road was the result of the failure of the com-
pany to furnish him with the necessary amount of funds, and their
neglect to procure the right of way for the location of the road.
These excuses seem to have originated since the commencement
of this suit.    It is true, some of the defendant's witnesses state,
generally, that the company failed to comply with their part of the
contract ; but at what time ; on what occasion ; in what particular ;
or to what extent, is left wholly unexplained and undefined by any
part of the testimony.    Other witnesses state, in vague and general
terms, that the company failed to furnish the defendants with par
funds.    But at what time the demand was made ; whether before,
or after the expiration of the time in which the contract was to be
completed ; whether, at the time of such demand, an advance was
necessary to the due progress of the work ; or whether such de-
mand was made before, or after the company had already advanced
an amount greater than that called for by their contract, are ques-
tions which the testimony leaves entirely unanswered.    And yet, di-
rect evidence on these points was indispensable to establish the
alleged default of the company.    To discharge one party to a con-
tract, on the ground of the failure of the other to perform his part,
such failure must be clearly established, by full, direct, and satis-
factory evidence.    Opposed to these general statements is the tes-
timony of W. H. Shelton, president of the company, who says,
on cross-interrogatory, that he does not believe that the company
was in arrear to Petrie on account of his contract, at the time when
he ceased to work on the road.    The deposition of *Wm. G. Bul-
lock*, who was book-keeper and teller of the company, proves, that
upwards of four hundred thousand dollars had been advanced on
account of the road, up to the 18th of November, 1839 ; more

than a month previous to the time at which the work is alleged to have been abandoned for the want of funds to carry it on.    Shelton says, that including the money advanced to obtain the iron rails, there had been advanced the sum of $312,000 ; and Petrie himself admits, by the exhibit to his own answer, that he had received the sum of $298,000, a sum greater than the amount which would have been due him according to his own claims, and it will appear that a large portion of this amount was advanced during the first year of the contract.    Now, what did the company receive in return for this large sum of money ?    It is admitted, that no turnouts, platforms, water-stations, warehouse, nor engine-house had been built.    No cars nor locomotive had been furnished, and no bridge built over Pearl river ; and yet, all these were to be done and furnished for a less sum of money than was actually received. Thus it will appear, that not more than half the work was done ; and that nothing was furnished necessary' to put the road in complete operation, according to his contract, at the time when he abandoned it.    From this view of the case, I think it evident, that there was no failure on the part of the company to supply the necessary funds ; and that it is equally evident, that Petrie was, at the time of the alleged settlement, largely in debt to them, for advances made to him on account of the contract.    There is equally as little ground for holding, that he was prevented from completing the road, for the right of way, along the tract over which the road was to pass.    There is no proof, to show that there was any interruption or delay on this score, during the two years, within which the contract was to be completed ; on the contrary, he appears to have had the undisturbed control over the entire way ; for he states in his own answer, that the grading was done the entire length of the road, and nothing further seems to have been attempted by him towards its completion.    I then conclude, upon this feature of the case, that Petrie was not hindered from performing the work, either by the want of means, or the want of the right of way ; and that having received large advances, and abandoned the road without finishing it, he must have been the debtor of the company, when they ordered him to be released and discharged from his contract.    If any embarrassment existed as to means, it may

perhaps be accounted for by the fact, that Petrie vested some forty or fifty thousand dollars in slaves, over and above the amount authorized by his contract, instead of applying it to the construction of the road.

2. The next question in the order of investigation, involves the nature and character of the alleged settlement, by which it is insisted, that Petrie was discharged from all liability to the company. Without stopping to inquire whether this settlement was consummated by the company, with such forms and solemnities as would give it validity as a corporate act, I proceed at once to inquire into its substance and effect upon the rights of the complainants, supposing it to be duly and technically executed. It is to be regretted, that the testimony in the case sheds so little light upon this branch of the subject. There is nothing to show that there ever was a mutual accounting between the parties. There are no items of charge and discharge; no balance-sheet struck, nor anything else, going to show what constituted the basis of the settlement. The resolutions upon the subject simply declare, that Petrie is discharged, and direct the mortgage to be *cancelled*; *but* whether any consideration passed; whether there was any settlement of accounts, or whether the resolutions were purely voluntary, are matters which are nowhere fully explained. There is, to be sure, a singular paper filed with the answer (as exhibit N.), bearing no date, and having no one's name, or other mark of authenticity, but which professes to be " an approximate estimate" of damages sustained by Petrie, by reason of the assumed failure of the company to comply with its part of the contract. In this paper, the most extravagant and speculative *data*, having no foundation in the facts and principles of the case, are assumed, as grounds for the calculation of damages; and then, the round sum of *eighty-five thousand* six hundred dollars is set down as the result; which sum, it is assumed, might, upon certain contingencies, have been either made on the one hand, or saved on the other. And the answer informs us, that, by this process, Petrie brought the company in debt, and that they agreed to allow his claim for damages, so far as to balance the *money accounts* between the parties.

A settlement made upon such vague hypothesis, and upon such

loose and speculative principles, relinquishing assets of an insolvent debtor, must be regarded as purely voluntary ; and can have no claim to validity, when opposed to a judgment creditor.    It seems to have been of a kindred character to another settlement, spoken of by some of the witnesses ; in which Petrie was given a *formal* discharge from all his liabilities, when about to proceed to New Orleans, in order to prevent him from being garnisheed there, by the creditors of the company.    But I consider it perfectly immaterial to this controversy, whether fraud, in fact, was intended by this settlement or not.    It is a matter of public history, and is also attested by the evidence in the case, · that this company was then on the eve of hopeless insolvency, and that the directors were dealing with its assets in the most reckless manner.    A voluntary transfer, or relinquishment of any portion of its assets, under such circumstances, is, within the contemplation and policy of the law, fraudulent and void as against creditors.    The directors were the trustees of the corporate funds, and were bound to administer them in good faith, for the benefit, alike of the stockholders and creditors of the institution ; and any one receiving such funds, from their hands, by voluntary transfer, or upon a mere assumed and colorable consideration, would, upon general principles, be bound to account to those for whose use such funds were held.    I think, then, that it is sufficiently established, that Petrie was in debt to the company for advances made to him, at the time of the alleged settlement, and that that debt was released without any valuable consideration being received therefor.    The claim to damages, by which this debt was balanced, is wholly unsustained by any fact in the case.    Even Petrie's answer shows that it is utterly groundless.    It will be recollected, that the assumed basis for this claim is the injury sustained by reason of the failure of the company to furnish the requisite funds ; and yet the answer shows that Petrie was so far indebted for advances made, as to make it necessary that he should get up a claim for $85·600, in imaginary damages, in order to balance accounts.

3. The next question is, whether the nature of Petrie's liability to the company is of that character, which may be pursued in equity by a creditor of the company ; and whether the complain-

ants show a case which authorizes them to sustain a bill for that purpose. In regard to the first branch of the inquiry, it seems now to be the rule in England, that in order to render a conveyance void, made by a debtor, it is necessary that the conveyance should embrace property liable to be seized by an execution at law, and applied to the payment of the debts of the grantor. As a consequence of this doctrine, it has been held, that a voluntary transfer of stock, choses in action, or other property not liable to be taken in execution, is good, notwithstanding the provisions of the statute of 13 Elizabeth.

It is said the provisions of that statute do not enlarge the remedies of creditors, nor subject to their demands any property of the debtor, which was not at law, or in equity, previously liable. Roberts on Frau. Con. 421, 422 ; Atherly on Mar. Sett. 220, 221 ; *Dundas* v. *Dutens,* 1 Ves. jr. 196 ; *M'Carthy* v. *Gold,* 1 Ball & Beatty, 390 ; 2 ib. 223 ; 1 Story's Eq. 361.

Such a distinction seems to me to be utterly inconsistent with the rights which result from the relation of debtor and creditor, and has no foundation in sound morals or just reasoning. It makes the right of the creditor depend upon the form and character which the fraud or caprice of the debtor may give to his property. It is difficult to perceive any solid reason why the intangible property and effects of a debtor should not be subjected to the payment of his debts equally with his chattels, which may be the subject of seizure and sale, under an execution at law. The abstract right of the creditor is as perfect in the one case as in the other. The spirit of an enlightened jurisprudence requires that the property, rights, and interests of the debtor, whatever may be their form, if they have an ascertained value, should be subject to the payment of his debts. Any other rule leads to fraud upon the creditor, and encourages dishonesty in the debtor ; who would only have to convert his property into the bond or promissory note of a third person, or into stock of some kind, and then settle the same on his family, in order to obtain a perfect immunity from his creditors.

A rule so fraught with mischief, and so subversive of the plainest dictates of reason, has no other support than that derived from the rule, which exempts mere choses in action from execution.

From that rule it is concluded, that as the creditor has no lien he has no right to follow the choses in action of his debtor, in the hands of a voluntary assignee. The reasoning by which this rule is supported is too purely artificial and technical to find any sanction in a court of equity ; it is fully answered by the language of Lord Hardwicke in the case of *Edgell* v. *Haywood* (3 Atk. R. 357), where he says ; "The court does not proceed in such case, on the ground of a lien, but only considers it a part of the property of the debtor, which the creditor cannot come at, without the aid of this court." The modern English doctrine upon this subject was fully examined, and its unsoundness as fully exposed, by Chancellor Kent, in the case of *Bayard* v. *Hoffman*, 4 John. Ch. Rep. 451. The same question was also ably examined, in the case of *Hadden* v. *Spader*, 20 John. R. 554.

In that case it was held, that the mere choses in action of a debtor might be followed into the hands of a voluntary assignee, and subjected in equity to the payment of a judgment creditor's claim. The same doctrine has been recognized by the Supreme Court of Kentucky. In the case of *West* v. *Saunders* (1 A. K. Marsh. Rep. 108), it was held, that an assignment of a debt, made with an intent to delay or defeat creditors, may be reached by them, whether they have a lien or not. But if precedents were wanting, I would now establish one in analogy to the proceeding authorized at law by our statutes, in favor of a judgment creditor, whose debtor has no visible property upon which an execution can act. In such case, he may garnishee the debtor of his debtor, and have the means of the former applied in satisfaction of the debt of the latter ; and, surely, the remedies of a court of equity should be equally as broad and comprehensive as those of a court of law. But in this particular case, the defendant's counsel suggest these additional objections to any relief. 1. That if there is any liability to the company, on the part of Petrie, it consists in unliquidated damages, that can only be ascertained by an action of covenant on the contract ; and that it is not therefore such an interest as can be pursued by the creditors of the company, either at law or in equity. 2. But that, at any rate, the liability of Petrie to the company amounts to mere equitable assets, and cannot be reached

by the complainants, until they have exhausted their remedies at law by a return of *nulla bona,* to an execution on their judgment, and that there is no evidence to that effect.   1. As to the first objection, I am fully satisfied, upon a fair construction of the agreement between the parties, that the mortgage to be given by Petrie was not only intended as a guaranty for the performance of the work, but was equally designed, at least, indirectly, to cover the amount of money that might be advanced upon the contract, in case the work was not done.   What was the object of the mortgage ? It is admitted that it was designed as indemnity to the company, against any loss or damages they might sustain by reason of Petrie's failure to comply with his part of the contract.

I pause here to inquire, in what items would the damages, thus provided against, chiefly consist ?   By the terms of the contract the company was to advance large sums of money, at short intervals, and in such sums as the prosecution of the work, and the purchase of the necessary appendages, might require.   It is too clear for argument, that these sums of money would constitute the leading criterion, in fixing the *quantum* of damages that might result from Petrie's failure to complete the road, and are therefore, in legal contemplation, clearly embraced within the mortgage.   To this extent the damages would be regarded as liquidated ; and, in this point of view, I must consider the mortgage as an undertaking, by Petrie, to refund the money agreed to be advanced, if he failed to perform the work, rather than as an indemnity against any speculative injury which might be sustained by the company, by reason of his failure to complete the road within the time prescribed by the contract.   2. Whether the second objection is well taken or not, must depend upon the facts of the case.   I have repeatedly decided, in accordance with the current of authority upon that subject, that to entitle a judgment creditor to come into this Court, for the purpose of having his judgment satisfied out of the equitable assets of his debtor, he must show that he pursued his remedies at law to every available extent, without being able to realize his debt. Such a showing is of the substance of his right to relief in this Court, and is not waived by a general answer.   *M'Elvain v. Willis,* 9 Wend. 548 ; 4 John. Ch. 671, 681, 687.

The foundation of his right to relief here, is, that he has none at law. The usual evidence in support of that proposition, is an execution returned no property found. It remains to be seen, whether the complainants have brought their case within the rule laid down. It appears that they have two distinct judgments at law against the Mississippi and Alabama Railroad Company. Upon one of these an execution was levied upon some town lots, which were sold for a small sum, and the sheriff returns that there was no other property of the defendant out of which to make the remainder of the money due on the execution. The first execution on the other judgment was returned no property found. Subsequently, executions were issued on both judgments, and levied, in part, upon the slaves mentioned in the bill ; upon which Petrie, in his bill, enjoined any sale thereof, setting up title to the property in himself. At this stage of things the commissioners filed their bill, alleging that the defendants in the judgments have an equitable interest in the property levied on by these executions, and praying that that interest may be ascertained, and subjected to the payment of their judgments. The evidence furnished, by the return of *nulla bona* to both executions, sufficiently establishes the complainants' right to equitable relief in the premises, unless the presumption thus raised is disproved by the subsequent levy on the slaves and other property. The defendants' counsel say, that the case shows that there was a levy on property under the execution at law, still subsisting and undisposed of, at the time of the filing of the bill. This is very true ; but the bill also shows, that the interest of the defendant in execution, in the subject of that levy, is of a character that cannot be subjected to sale under a judgment at law ; and hence results both the right and the necessity of coming into this Court to make that levy available. The bill, therefore, as well as the facts of the case, are in support of the conclusion resulting from the return of *nulla bona;* because, they show that the defendants in execution have nothing which can be reached by process at law. The position taken by counsel would leave the complainants entirely remediless. If they attempt to move at law, they are met with the objection, that there is nothing in the subject of the levy upon which an execution can act : if they come into equity, the pendency of a levy at law is pleaded as an

estoppel to any relief here.    The case of *Perry* v. *Nixon* (1 Hill's Ch. Rep. 336) is a decision upon this very point.    It was there held, that a judgment creditor, who had levied an execution upon the equitable property of his debtor, was entitled to the aid of a court of equity in subjecting such property to the payment of his debt.    In the case of *McDermott* v. *Strong* (4 John. Ch. Rep. 691), Chancellor Kent, referring to the equitable interest of a debtor, says the creditor must first take out execution and cause it to be *levied* or returned, so as to show thereby that his remedies at law fail.    I am satisfied from these authorities, and upon principle, that the defendants show sufficient in this particular to entitle them to the relief asked.    I do not find it necessary to determine, in this case, whether the complainants could sustain a bill without having first pursued a course at law, upon the ground of a *trust* in the corporation for their use.    Such a bill was sustained under very similar circumstances by Mr. Justice Story, in the case of *Wood* v. *Dummer*, 3 Mason, 308.    I think the complainants have gone a sufficient length at law to entitle them to invoke the aid of this Court.

I had some doubt, upon first looking at this case, whether the contract was not to be regarded as mutual and dependent in its parts, and as entire and indivisible in its nature ; and whether, as a consequence thereof, Petrie would not be bound to refund the whole amount of money received, without retaining anything for, the amount of the work actually done, he having abandoned his contract without sufficient cause.    But, upon a more careful consideration of the features of the case, I think he is entitled to retain an amount equal to the actual value of the work done, to be determined with reference to the amount to be paid for the whole work.    In the first place, his abandonment of the work seems to have taken place with the assent of the company, which of itself would bind them to pay him as on a *quantum meruit*.    In the next place, the company was bound to pay him in instalments, as the progress of the work required, and not when the work was completed.    This I think must be construed as an agreement to pay so much at different periods as the work then done might be worth.    This was the construction placed by the Supreme Court of New York, in the case of *Cunningham* v. *Morrel* (10 John. Rep. 205), upon a contract very similarly

worded. In that case, the plaintiff had contracted to build a piece of turnpike-road, for which the defendant was to pay $6000 *in instalments, as the work progressed.* The Court held, that the plaintiff would be entitled to recover a ratable part of the money upon showing a ratable performance of the work ; but that, if he went for the *whole* consideration, he must show a performance of the *whole* work. Upon the whole, I think that I am bound to declare the settlement and release made to Petrie as fraudulent and void, as against the complainants, as the judgment creditors of the company; and shall refer the case to a commissioner, to take testimony and to state an account, showing what amount is due from Petrie to the company, after allowing him a ratable sum for the work actually done on the road, to be ascertained with reference to the *whole sum* agreed to be paid for the *whole work.* I give no opinion now upon the point, whether Petrie will be allowed to pay such balance, when ascertained, in the depreciated paper of the company or not. That and all other questions are reserved until the coming in of the report. Let a decree be drawn accordingly.